EXHIBIT A

Daniel A. Salvatierra, D.O.  ⋮  IN THE COURT OF COMMON PLEAS
                             ⋮  OF ERIE COUNTY, PENNSYLVANIA
        vs.                  ⋮
                             ⋮  NO. 10849-2023
Lake Erie College of         ⋮
Osteopathic Medicine         ⋮
(LECOM)                      ⋮

**TO:**

## NOTICE

    You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action with twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

    YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

    IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral & Information Service
P.O. Box 1792
Erie, PA 16507
814-459-4411

IN THE COURT OF COMMON PLEAS OF ERIE COUNTY, PENNSYLVANIA

| | |
|---|---|
| DANIEL A. SALVATIERRA, D.O., | ) NO. *10849- 2023* |
|     Plaintiff | ) |
| vs. | ) CIVIL ACTION – LAW |
| | ) |
| LAKE ERIE COLLEGE OF | ) |
| OSTEOPATHIC MEDICINE (LECOM), | ) |
|     Defendant | ) |

## COMPLAINT

Plaintiff, Daniel A. Salvatierra, D.O., appears before this court seeking damages in excess of $50 million dollars from Defendant, Lake Erie College of Osteopathic Medicine (LECOM).  Such damages arise out of the destruction of Plaintiff's medical career, permanent and irreparable injury to Plaintiff's professional reputation, massive financial loss of future income, profound emotional distress, and punitive damages.

## PARTIES

1.  Dr. Salvatierra is an adult individual currently residing in Las Vegas, Nevada. His mailing address is P.O. Box 777183, Henderson, NV 89077.

2.  Defendant is Lake Erie College of Osteopathic Medicine (LECOM), an educational institution located at 5515 Peach St., Erie, Pennsylvania, 16509.  LECOM is

A TRUE COPY ATTEST
PROTHONOTARY

1

the sponsoring institution for all residency programs at Millcreek Community Hospital (MCH), also located at 5515 Peach St., Erie, Pennsylvania, 16509.

## JURISDICTION AND VENUE

3. This court has personal jurisdiction over Plaintiff, Dr. Salvatierra.

4. This court has jurisdiction over Defendant, LECOM.

5. This court has jurisdiction over the subject matter of the present action.

6. The events and occurrences forming the factual nexus and subject matter of Plaintiff's complaint against Defendant took place within the Erie County District, State of Pennsylvania.

## FACTS

7. Plaintiff entered into a contractual agreement with Defendant for both employment **and** graduate medical education at MCH on January 9, 2018 in Defendant's Internal Medicine Residency Program. The Internal Medicine Program Director was Eric Milie, D.O. Dr. Milie was an employee and an agent of the Defendant. Plaintiff had just completed his medical school studies at the LECOM Erie campus as a member of the Class of 2017 with an official graduation date of December 31, 2017.

8. A brief overview of medical education in the United States is necessary. A resident physician (student doctor) is unique in American society in that, while attending an accredited residency training program, he/she is both a full-time employee **and** a full-time student doctor. As such, this special, dual status nullifies any argument by the Defendant that an at-will employment condition existed at the hospital. Plaintiff was

dismissed from Defendant's Internal Medicine Residency Program at MCH on April 17, 2019 and received no worker's compensation whatsoever.

9.   The Defendant's Internal Medicine Residency Program, along with other residency programs throughout the country, exist under the auspices of the non-profit Accreditation Counsel for Graduate Medical Education (ACGME), located at:  Suite 2000, 401 North Michigan Avenue, Chicago, Illinois 60611.  The Defendant's Internal Medicine Residency Program identification number with the ACGME is:  1404100908.

10.   The ACGME governs and oversees the proper training of most resident physicians throughout the United States of America.  The ACGME awards hospitals, such as MCH, accreditation to train and educate resident physicians in any number of specialties, from surgery to internal medicine.  In doing so, ACGME mandates that the sponsoring institutions must fully comply with their published requirements.  These requirements establish a legal and binding contract among the ACGME, the Defendant, and the Plaintiff.  The contract is valid and enforceable.  Later, it will be shown that violations of the contract by the Defendant resulted in the involuntary withdrawal of ACGME accreditation and the termination of the Internal Medicine Residency Program.

11.   In 2018 and 2019, two ACGME requirements existed with respect to internal medicine at MCH.  The first contract is entitled, "ACGME Program Requirements for Residency Education in Internal Medicine."  This contract was effective on July 1, 2007 and was 39 pages long.  It should be noted that an updated version of this requirement was released by the ACGME after Plaintiff's employment was terminated.  The other ACGME contract is entitled, "ACGME Common Program Requirements."  This contract

was effective July 1, 2017 and was 27 pages long. Knowing that these ACGME
contracts were in place at MCH in 2018 and 2019, Plaintiff willingly and eagerly agreed
to employment and enrollment into Defendant's and MCH's Internal Medicine Residency
Program.

12. With respect to the educational nature of residency, the financial
compensation to a teaching hospital (essentially, tuition payments) originates from the
Centers for Medicare and Medicaid Services (CMS). It must be stressed that this funding
constitutes **federal, taxpayer dollars**. The formal education and training of resident
physicians in America carries significant government and public interest.

13. Thus, a true contract existed with all required legal elements in place. There
was a written agreement (ACGME requirements), in which an offer had been made;
acceptance by the Plaintiff who reasonably expected legitimate employment and proper
graduate medical education; and consideration (taxpayer dollars from CMS) for the
Defendant and MCH with a hospital salary afforded to the Plaintiff ($50,500/year).

14. The ACGME's requirements contain very stringent rules to protect and
nurture the dual character of residency at a training hospital. Resident physicians are
entitled to all the rights and privileges of any other employee working in the United
States of America. Concurrently, resident physicians are assured, under the ACGME's
requirements, of receiving frequent, direct supervision by board-certified attending
physicians who assume varying degrees of legal and medical responsibilities in the
teaching, mentoring, and instruction of individual student doctors into confident,
independent attending physicians. The academic persona of the student doctor is plainly

4

evident when learners "graduate" from their residency programs after a predetermined

number of years.  They ascend to the status of attending physician and are no longer

**student** doctors.  To be clear, Plaintiff's ultimate dream is to become a board-certified

attending physician.

15.  Still, another unique aspect of residency in the osteopathic pathway is the fact

that resident physicians, whether working as a Family Medicine physician, OB/GYN

physician, Surgeon, or Internal Medicine physician, are classified as "Osteopathic

Graduate Trainees."  A license to practice medicine in the Commonwealth of

Pennsylvania is issued from the Osteopathic Medical Board in Harrisburg, PA.  To repeat

for emphasis, student doctors are **trainees**, not board-certified attending physicians, and

this severely limits their stature at training hospitals.  Trainees function from a much

weaker positions of power and authority compared to their attending physicians.

16.  Plaintiff's Pennsylvania License Number was OT018202.  The Registration

Code was 19320244.

17.  Plaintiff signed a contract of employment with MCH on January 8, 2018.  The

contract was co-signed by Mary L. Eckert, President/Chief Executive Officer of

Millcreek Community Hospital, and Deborah Lee-Sanko, Designated Institutional

Official (DIO).  Finally, the President and CEO of LECOM is John Ferretti, D.O. who

maintains a frequent presence at Millcreek Community Hospital.

18.  The statute of limitations for a breach of contract in the Commonwealth of

Pennsylvania is four years.  Although Plaintiff's contract of employment ended on June

30, 2019 at MCH, Plaintiff argues that several breaches of contract occurred on April 17,

2019.  Plaintiff files this civil lawsuit in Erie County's Court of Common Pleas before the

statute of limitations for breach of contract in Pennsylvania expires on April 17, 2023.

## COUNT I:  BREACH OF CONTRACT

19.  In early-April 2019, a patient fell to the floor in Plaintiff's close proximity.

The incident occurred in the hospital's emergency room while Plaintiff was interviewing

the patient.  Due to HIPPA regulations, very limited information can be disclosed

concerning the patient.  Regardless, follow-up examination determined that the patient

did not suffer any life-threatening, permanent, or even serious injury from the fall in the

ER.  Plaintiff assumed that the fall was of minor consequence and that proper medical

treatment should proceed per sound medical practice.  It is well documented that a patient

who is admitted to a hospital for any length of time can experience a fall despite

numerous precautions taken by hospital employees.

20.  On April 17, 2019, Plaintiff sat down for a third and final performance

evaluation meeting.  The others in attendance were Dr. Erie Milie, Mr. John Onorato,

Esq. MBA (Human Resource, Risk Officer, and MCH lawyer), Deborah Lee-Sanko

(DIO), and Kaitlin Hanes (Internal Medicine Coordinator).  All four individuals were

employees and agents of the Defendant.  Mr. John Onorato started the meeting by

informing Plaintiff that an investigation was conducted concerning the patient fall in

early-April (a few weeks earlier).  Plaintiff was not aware that an investigation had been

conducted.  Plaintiff had not received any communication whatsoever from the Internal

Medicine Program Director, the hospital lawyer, other doctors, or even any nurses of

such an investigation.  At that moment, Plaintiff assumed Mr. Onorato would ask for an

6

oral or written statement as required under due process procedures.  But then, Mr.
Onorato stated that the investigation had been completed; the results were typed up into a
formal report; and the document was sent to the Pennsylvania Patient Safety
Administration, 333 Market Street, Lobby Level, Harrisburg, PA 17101.  Once Mr.
Onorato divulged this information, Plaintiff realized unequivocally that his right to due
process was illegally and unethically withheld from him by the Defendant.

21.  In the ACGME's Common Requirements, it states, VI.A.1.a).(3)., "Reporting,
investigation, and follow-up of adverse events, near misses, and unsafe conditions are
pivotal mechanisms for improving patient safety, and are essential for the success of any
patient safety program… Residents **must** participate as team members in real and/or
simulated interprofessional clinical patient safety activities, such as root cause analyses or
other activities that include analysis, as well as formulation and implementation of
actions."  By not involving the Plaintiff in the formal investigation of a patient safety
adverse event, this constitutes a breach of contract in addition to the withholding of
Plaintiff's legal right to due process of law.

22.  The ACGME Common Requirements further state, VI.A.1.a).(3).(a).(iii),
"Residents, fellows, faculty members, and other clinical staff members must be provided
with summary information of their institution's patient safety reports."  Plaintiff was not
provided any report of the patient fall incident in early-April 2019.  This deprivation
constitutes an additional breach of contract.

23.  Two more violations occurred during the April 17, 2019 meeting just a few
seconds later.  The Internal Medicine Program Director, Dr. Erie Milie, announced that

the Plaintiff was dismissed from his Internal Medicine Residency Program effective immediately.  Both he and Mr. John Onorato then exited the room.

24.  The first breach centers on training.  The ACGME Program Requirements for Residency Education in Internal Medicine, II.A.4.a states, "The Program Director **must** administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas.  The program director **must** oversee and ensure the quality of didactic and clinical education in all sites that participate in the program."  Plaintiff trusted his Program Director to assign training as needed when deficiencies in the Plaintiff's performance in any of the ACGME core competency areas were discovered.  Plaintiff had reasonably assumed that his progress with the Defendant was satisfactory per the positive marks and scores on his monthly performance evaluations written by Dr. Milie and other faculty members.  Plaintiff was not afforded any individualized tutoring sessions, reading lists, one-on-one instruction, and other academic resources by attending physicians during his employment.  But with his sudden dismissal from the Internal Medicine program, Plaintiff realized Dr. Milie's dereliction of duty to maintain an educational environment centered on Plaintiff's needs.  This discovery of this breach of contract occurred on April 17, 2019.

25.  The second breach concerns the suppression of Plaintiff's academic due process rights.  In the ACGME Program Requirements for Residency Education in Internal Medicine, VI.J. Grievance procedures and due process, the contract states, "1.  In the event of an adverse annual evaluation, a resident must be offered an opportunity to address a judgment of academic deficiencies or misconduct before a formally constituted

8

clinical competence committee.  2.  There must be a written policy that ensures that academic due process is provided."

26.  This academic due process was never offered or afforded to Plaintiff after a November 19, 2018 performance meeting, after a February 11, 2019 performance meeting, and after the April 17, 2019 performance meeting.  Again, Plaintiff had reasonably assumed that his progress with the Defendant was satisfactory per the positive marks and scores on his monthly performance evaluations written by Dr. Milie and other faculty members.  Defendant had every opportunity to afford academic remedies and academic due process to the Plaintiff but failed to do so.  Because Plaintiff was dismissed from the program on April 17, 2019, no further opportunities existed for the Plaintiff to receive academic due process.  Therefore, a breach of contract occurred, starting on April 17, 2019.

27.  In the ACGME Common Requirements, V.A.1.a, it states, "At a minimum, the Clinical Competency Committee must be composed of three members of the program faculty.  (a) These additional members must be physician faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents in patient care and other health care settings."  Plaintiff points out that the other attendees of the three performance meetings consisted of a lawyer, a Designated Institutional Official (DIO), and a secretary, none of whom were board-certified attending physicians who maintained extensive contact and experience with residents in patient care and other health care settings.

28.   Another breach of contract occurred several minutes after the April 17, 2019 meeting.  The devastating dismissal from the Internal Medicine Residency Program left Plaintiff in a state of shock.  Dr. Erie Milie and Mr. John Onorato did not ask Plaintiff to sign any document during the meeting.  After a brief discussion with Deborah Lee-Sanko and Kaitlin Hanes, Plaintiff walked several feet down the hallway to the hospital's library and sat down to try to process what just happened.  Suddenly, Kaitlin Hanes entered the library, walked up to Plaintiff, and told Plaintiff to sign a piece of paper.  Plaintiff did so, and she left the library immediately.  Plaintiff does not remember what was signed. Plaintiff later asked her for a copy, but she never gave one.

29.   As she stood next to Plaintiff in the library, Kaitlin Hanes, at no point, informed Plaintiff of his Miranda rights, Plaintiff's right to remain silent, or Plaintiff's right to an attorney.  In this period of deep shock, Plaintiff was not in any kind of emotional, mental, or intellectual state to knowingly and willingly agree to waiving any of Plaintiff's rights.  In other words, Plaintiff was unable to achieve informed consent that day while in a state of shock after the April 17, 2019 meeting.  Kaitlin Hanes should have known this as well.  Furthermore, none of the four individuals met with Plaintiff the following day, April 18, 2019, or later to guide Plaintiff on how to take the next steps with an appeal process.  Plaintiff will argue in court that any document that Plaintiff signed on April 17, 2019 if presented by the Defendant as evidence should be thrown out.

30.   The ACGME Program Requirements for Residency Education in Internal Medicine, II.A.4.h state, "The Program Director **must ensure compliance** with grievance and due process procedures as set forth in the Institutional Requirements and

implemented by the sponsoring institution." The contract clearly identifies Dr. Erie

Milie as primarily responsible for guaranteeing and enforcing Plaintiff's right to due

process, not Kaitlin Hanes. The Internal Medicine Program Director, yet again, failed in

his contractual duty to properly inform Plaintiff of the right to appeal, the right to file a

grievance, the right to legal counsel, the right to remain silent, the right to be helped by a

Clinical Competency Committee, and the right to due process. Dr. Milie's inactions

constitute a serious, unethical, and egregious breach of contract of a legal nature.

Nothing in the ACGME requirements even remotely encourages such wanton disregard

for the rights of a student doctor or trainee employed and enrolled at an accredited

training hospital.

31. In another important matter, Plaintiff had suspicions of discrimination in 2018

when a fellow Internal Medicine Resident Physician of the Class of 2017 was promoted

to second year of residency despite being fired from his Corry hospital rotation, being

removed from the Weekend On-Call schedule for nine months, and being forbidden from

performing a month of IM Nights at Millcreek Community Hospital during his first half

of Internal Medicine residency. Since suspicion does not equate to evidence, Plaintiff

needed a neutral, credible third party to validate his suspicions.

32. Plaintiff's last full day of employment at the hospital was on June 30, 2019.

In October 2019, Plaintiff received legal counsel from a lawyer contracted with the

Department of Veterans Affairs who recommended that a case of discrimination be filed

with the Equal Employment Opportunity Commission (EEOC) at the Pittsburgh Area

Office, 1000 Liberty Avenue, Room 1112, Pittsburgh, PA 15222. Plaintiff followed the

11

legal counsel afforded to him.  Then, on March 6, 2020, Defendant submitted a Position

Statement to the EEOC in response to Plaintiff's EEOC charge.  On page 3, the

Defendant wrote, "Page 1 of a Report to the Pennsylvania Patient Safety Administration

– The report of our patient safety officer of a type "D" event, which is among the most

serious, the facts of which as set forth in Dr. Edwards Affidavit."  With their Position

Statement, the Defendant had now informed a **federal** agency of the fall incident without

ever having afforded Plaintiff his right to make a statement during a formal investigation

and his right to due process of law as required by the ACGME requirements.  Of note, the

Defendant's Position Statement to the EEOC was signed by Mr. John Onorato.

33.  In December 2021, the EEOC finally made a ruling concerning Plaintiff's

case.  The two-year investigation revealed that the EEOC could not determine whether

racial and/or age discrimination occurred at MCH, but the EEOC did issue Plaintiff a

Right to Sue Letter.  Alas, Plaintiff was unable to afford a lawyer to represent him in a

discrimination lawsuit against the Defendant.  The charge number for Plaintiff's EEOC

case is:  533-2020-00178.  The EEOC investigator was Victoria Rodia.

34.  The EEOC's Right to Sue letter, dated October 6, 2021, states, "The EEOC

issues the following determination:  The EEOC will not proceed further with its

investigation and makes no determination about whether further investigation would

establish violations of the statute. **This does not mean the claims have no merit.  This**

**determination does not certify that the respondent is in compliance with the**

**statutes**.  The EEOC makes no finding as to the merits of any other issues that might be

construed as having been raised by this charge."  Plaintiff stresses to the court that the

EEOC did not rule that "The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC." From this determination in the Right to Sue letter, Plaintiff concluded that he may have mostly likely been a victim of unlawful discrimination.

35.  With that, Plaintiff claims that Defendant committed another breach of contract. In the ACGME Common Program Requirements, VI.B.6, it states, "Programs must provide a professional, respectful, and civil environment that is free from mistreatment, abuse, or coercion of students, residents, faculty, and staff. Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns." Plaintiff argues that the advancement of a fellow Internal Medicine Resident Physician of the Class of 2017, despite all of his problems, while not advancing Plaintiff, despite his successful achievement of mandatory milestones, constitutes an **unprofessional** environment at MCH. This unprofessional environment is a breach of contract. And this determination was reached on October 6, 2021 with the publishing of the EEOC Right to Sue letter. This date falls well within the four-year statute of limitations for breach of contract. The statute starts on the date that the contract was determined to be breached. That determination occurred on October 6, 2021.

36.  Several other facts warrant the court's strongest consideration. In 2020, the Defendant's Internal Medicine Program Director, Dr. Erie Milie, was removed from his position by the ACGME for cause. Plaintiff has been unable to acquire documentation

from the ACGME or elsewhere concerning the nature of Dr. Milie's dismissal.  He was

replaced by Dr. Jean Storm.  Then, on July 31, 2022, the ACGME withdrew the

accreditation of the Internal Medicine Residency Program from the Defendant and from

Millcreek Community Hospital.  Plaintiff has been unable to acquire documentation from

the ACGME or elsewhere that explains in detail why they took such drastic action.

These two powerfully probative pieces of evidence strongly suggest major problems with

the Defendant and MCH.  Plaintiff asks, "would Dr. Milie have been fired and the

Defendant have lost accreditation if both had rigorously executed all ACGME

requirements satisfactorily?"  Plaintiff's career and financial injuries may have been

avoided if Plaintiff attended a legitimate training hospital with competent, caring,

passionate, and ethically-guided attending physicians who strictly adhered to ACGME

requirements.  And what unknown harms have been inflicted on the community of Erie,

Pennsylvania during Dr. Eric Milie's tenure as Defendant's Internal Medicine Program

Director?

37.  By reason of the facts and circumstances stated above, Defendant has

breached the contract established by the ACGME.  More breaches of contract will most

likely be found during the discovery and deposition phases of this case if this lawsuit is

allowed to move forward by the court.

38.  As a direct result of the failures of the Defendant to properly train the Plaintiff

per ACGME requirements, Plaintiff has subsequently suffered massive, substantial, and

permanent injury.  Refusal to promote Plaintiff to his second year of residency and

releasing Plaintiff from the Internal Medicine Residency Program prematurely have

imbued glaring "red flags" that other employers in the medical field cannot ignore. Plaintiff has, thus, been unable to secure employment within another residency program at another hospital anywhere in the United States or abroad. Plaintiff was willing to repeat first year of residency so Plaintiff applied to the 2022 Match. No hospital offered Plaintiff an interview. During the SOAP phase of the 2022 Match, Plaintiff did receive only one 3-minute telephone interview with a program director at a training hospital in Cleveland, Ohio. But Plaintiff was not offered a spot in their internal medicine residency program.

39. Plaintiff's wife wanted to leave Erie, PA for another more diverse city with more job opportunities. So, both moved to Las Vegas, Nevada. Because Plaintiff is a first-generation American to parents who immigrated from the Philippines, no generational wealth exists to help the Plaintiff and his wife. Consequently, Plaintiff and his wife have struggled financially since mid-2019. Paying overwhelming student loan debts have been particularly frustrating each month. As of this writing, Plaintiff's TransUnion score is 485. Plaintiff even applied to secondary medical positions in Las Vegas, such as transcriptionist, phlebotomist, and physician assistant. But no jobs were offered to the Plaintiff. Why should a small clinic hire a medical doctor to just perform the work of a receptionist?

40. Since no one in the medical community would hire Plaintiff despite major staffing shortages, Plaintiff had no choice but to accept work as an Uber Eats delivery driver in August 2021 in order to generate some income. As of this writing, Plaintiff has completed 3,070 deliveries of pizza, sushi, and McDonalds to the people of Las Vegas,

Nevada. A medical doctor with an advanced degree should not be delivering barbeque chicken, ice cream, and boba tea to teenagers and young adults. With each food delivery, Plaintiff feels profound humiliation, embarrassment, and rage. Plaintiff deeply regrets giving up a promising career as a U.S. Naval Officer who graduated from the U.S. Naval Academy in May, 1996 and who completed a combat tour in Iraq in 2006-2007. Plaintiff's pay as an Uber Eats driver during a very busy month of deliveries, at best, climbs to only 4.7% of the monthly pay that an internal medicine attending physician earns. Plaintiff's current lifestyle is unacceptable and unsustainable.

41. The accumulated struggles that have befallen Plaintiff and his wife have severely damaged marital well-being along with festering tremendous emotional, mental, and even physical suffering in both. Plaintiff struggles with sleep, anxiety, and depression daily. Plaintiff requires two medications to control hypertension. Plaintiff and his wife argue constantly about how to progress with their lives. Suggestions of divorce are frequent. Even Plaintiff's parents have anguished at the situation with the Plaintiff's father essentially shutting him out of his life. Plaintiff has lost most of his closest friends, and the majority of family members have stopped communicating with him. Plaintiff has exhausted all options to resolve his situation through the medical system. Now, Plaintiff seeks dispute resolution through the courts. Without substantial financial resources to pay for a lawyer, Plaintiff has no choice but to move forward with a lawsuit as a pro se litigant, for now.

**PRAYER FOR RELIEF**

16

42. Thus, as compensation for lost wages from a now destroyed 20-year medical career, compensation for consequential damages including a poor credit score and higher interest rates on payday loans, for three years of emotional distress, and punitive damages for breach of contract, Plaintiff is asking for $50 million dollars.

WHEREFORE, Plaintiff requests judgment in his favor and against the Defendant for:

1.  Breach of contract.

and also

2.  $50 million dollars representing the total value of all lost future income, reputational damage, emotional distress, and punitive damages which are the subject matter of this complaint.

Respectfully submitted,

Signature:       *Daniel A. Salvatierra, D.O.*

Address:         P.O. Box 777183

                 Henderson, NV 89077

Phone number:    (410) 940-5527

## VERIFICATION

I, Daniel A. Salvatierra, D.O., state that I am the Plaintiff in the foregoing matter and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.  I further understand that false statements made

herein are subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

Date: _April 13, 2023_      _Daniel A. Salvatiera, D.O._
                            (signature of Plaintiff)