## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL A. SALVATIERRA, D.O.,  ·  ) | CIVIL ACTION |
| ) | |
| Plaintiff     ) | **AMENDED** |
| ) | **COMPLAINT** |
| v.    ) | |
| ) | No. 1:23-cv-00152 |
| LAKE ERIE COLLEGE OF    ) | |
| OSTEOPATHIC MEDICINE (LECOM),    ) | |
| ) | |
| Defendant    ) | |
| ) | |

**FILED**

**JUN 1 3 2023**

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## AMENDED COMPLAINT

Plaintiff, Daniel A. Salvatierra, D.O., appears before this court seeking damages

totaling $50 million dollars from Defendant, Lake Erie College of Osteopathic Medicine

(LECOM). Such damages arise out of the destruction of Plaintiff's medical career,

permanent and irreparable injury to Plaintiff's professional reputation, massive financial

loss of future income, profound emotional distress, and punitive damages.

## PARTIES

1. Dr. Salvatierra is an adult individual currently residing in Las Vegas, Nevada.

Plaintiff's mailing address is P.O. Box 777183, Henderson, NV 89077.

2. Defendant is Lake Erie College of Osteopathic Medicine (LECOM), an

educational institution located at 5515 Peach St., Erie, Pennsylvania, 16509. LECOM is

the sponsoring institution for all residency training programs at Millcreek Community

Hospital (MCH), also located at 5515 Peach St., Erie, Pennsylvania, 16509.

## JURISDICTION AND VENUE

3. This court has personal jurisdiction over Plaintiff, Dr. Salvatierra.

4. This court has jurisdiction over Defendant, LECOM.

5. This court has jurisdiction over the subject matter of the present action.

6. The events and occurrences forming the factual nexus and subject matter of Plaintiff's complaint against Defendant took place within the Erie County District, Commonwealth of Pennsylvania.

## FACTS

7. Plaintiff knowingly and willingly entered into a contractual agreement with Defendant for both employment **and** graduate medical education on January 9, 2018 in Defendant's Internal Medicine Residency Program. The Internal Medicine Program Director was Eric Milie, D.O. Dr. Milie was an employee and an agent of the Defendant. Plaintiff had just completed his medical school studies at the LECOM Erie campus as a member of the Class of 2017 with an official graduation date of December 31, 2017.

8. A brief overview of medical education in the United States is necessary. A resident physician (student doctor) is unique in American society in that, while attending an ACGME-accredited residency training program, he/she is both a full-time employee **and** a full-time student doctor. As such, this special, dual status nullifies any argument by the Defendant that an at-will employment condition existed at the hospital. Plaintiff was dismissed from Defendant's Internal Medicine Residency Program on April 17, 2019 and received no worker's compensation whatsoever. As of this writing, Plaintiff is still a first year internal medicine resident physician even though he graduated from medical school in December 2017.

2

9.  The non-profit Accreditation Counsel for Graduate Medical Education

(ACGME), located at:  Suite 2000, 401 North Michigan Avenue, Chicago, Illinois 60611,

governs and oversees the proper training of most resident physicians throughout the

United States of America.  The ACGME awarded LECOM, not MCH, accreditation to

train and employ resident physicians in internal medicine in 2017.  Upon awarding

accreditation, the ACGME mandates that sponsoring institutions, including LECOM,

**must** fully comply with their published requirements.  These requirements lay the

foundation for a legal and binding contract among the ACGME, the Defendant, the

Plaintiff, and the Centers for Medicare and Medicaid Services (CMS).  This massive

contract is pivotal to ensuring the proper training of student doctors and for the

optimization of public health and safety.

10.  The Defendant's Internal Medicine Residency Program identification number

with the ACGME is:  1404100908.[1]  Exhibit A shows a printout of the ACGME website

identifying LECOM, not MCH, as the sole, responsible sponsoring institution in

Plaintiff's complaint.  MCH is the building with its support staff in which the education

and employment of resident physicians occurs.  Violations of the ACGME requirements

by the Defendant resulted in the involuntary removal of the Internal Medicine Program

Director, the withdrawal of ACGME accreditation, the termination of the Internal

Medicine Residency Program, the stoppage of CMS funding, and the end of the

--------

[1] A true and correct copy of the ACGME website page is attached hereto as Exhibit A.

3

contractual arrangement. Exhibit A reveals the complete loss of accreditation of Defendant's Internal Medicine Residency Program occurring on July 31, 2022.

11. Next, a careful examination of the ACGME requirements is in order. In 2018 and 2019 during Plaintiff's employment, two ACGME requirements existed with respect to internal medicine at LECOM. Exhibit B shows the first contract entitled, "ACGME Program Requirements for Residency Education in Internal Medicine." [2] This contract was effective on July 1, 2007 and was 39 pages long. It should be noted that an updated version of this requirement was released by the ACGME after Plaintiff's employment was terminated. The other ACGME contract relevant to this complaint is provided in Exhibit C and is entitled, "ACGME Common Program Requirements." [2] This contract was effective July 1, 2017 and was 27 pages long. With these two ACGME requirements in place and the Defendant fully accredited in Internal Medicine, Plaintiff knowingly, willingly, and in good faith, agreed to employment and enrollment expecting the Defendant to execute 100% of all ACGME requirements to the best of their ability.

12. Meanwhile, a separate contract was established on January 8, 2018. Exhibit D is the contract signed between the Plaintiff and Millcreek Community Hospital.[2] This contract was deemed by the Plaintiff to exist for employment purposes only. It addressed parking, sick days, and other typical employment issues. This contract was co-signed by

---

[2] A true and correct copy of the ACGME Program Requirements for Residency Education in Internal Medicine is attached hereto as Exhibit B. A true and correct copy of the ACGME Common Program Requirements is attached hereto as Exhibit C. A true and correct copy of the contract with addendums is attached hereto as Exhibit D.

Mary L. Eckert, President/Chief Executive Officer of Millcreek Community Hospital,

and Deborah Lee-Sanko, Designated Institutional Official (DIO).

13. The MCH contract in Exhibit D did not fully address the educational status of

a resident physician and thus, cannot be the contract applied in Plaintiff's dismissal from

the Internal Medicine Residency Program. In Section O, the MCH contract states, "The

training program at LECOM Health/Millcreek Community Hospital is an AOA

Accredited program. The trainee understands that completion of this training program

may not guarantee eligibility for entry into the Accreditation Council for Graduate

Medical Education – (ACGME) accredited advanced standing residencies and

fellowships. A graduating trainee may be considered for ACGME advanced fellowships

by applying for a fellow eligibility exception through the process outlined in section

III.A.2.b at the ACGME Common Program Requirements." Furthermore, the Millcreek

Community Hospital House Staff Employee Manual,[3] Exhibit E, states on page 5,

"Millcreek Community Hospital is accredited by the AOA-HFAP and is associated with

AOA-COCA accredited Lake Erie College of Osteopathic Medicine. It is a member

hospital of the Lake Erie Consortium for Osteopathic Medical Training. This training

manual complies with all standards set forth by these governing bodies as well as the

AOA specialty colleges' residency standards." The American Osteopathic Association

(AOA) is located in 142 E. Ontario St., Chicago, IL 60611-2864.

---

[3] A true and correct copy of the Millcreek Training Program Manual/House Staff Manual
which is attached hereto as Exhibit E.

14. Plaintiff questions the credibility of the MCH contract in Exhibit D and the

Millcreek Community Hospital House Staff Employee Manual, Exhibit E, with respect to

training. Which organization is legally and medically responsible for the graduate

medical education of internal medicine resident physicians in the United States? Is it the

AOA or is it the ACGME? Plaintiff was taught in medical school that the ACGME is

ultimately responsible. Evidence of this can be found in Exhibit A. The ACGME

awarded accreditation to LECOM, not MCH, for the training of IM resident physicians at

MCH. The ACGME also exercised its authority by taking away that accreditation on

July 31, 2022. Without ACGME accreditation, LECOM cannot train internal medicine

resident physicians at Millcreek Community Hospital. Note that for 11 months, no

internal medicine resident physician has been employed and trained at MCH. Still, MCH

maintains its AOA-accreditation. So it is logical to conclude that an AOA-accreditation

does not afford MCH legality or credibility in formally **training and graduating** internal

medicine resident physicians. If the MCH contract in Exhibit D was the basis for

Plaintiff's dismissal due to academic reasons, then this may constitute a breach of

contract since an AOA-accredited entity cannot formally train and graduate a resident

physician. This power lies solely with an ACGME-accredited entity, which in Plaintiff's

complaint is LECOM. A fundamental argument of Plaintiff's lawsuit is that the attending

physicians and agents of LECOM breached their contractual duties of executing the

ACGME requirements of Exhibit B and C. Referencing the MCH contract as the sole

contract is improper and may even be illegal, not applicable, and/or unethical. The

Commonwealth of Pennsylvania designated Plaintiff as an Osteopathic Graduate

Trainee.[4]  See Exhibit F.  As a trainee, Plaintiff was entitled to formal, legitimate, and accredited training.  So again, who was legally and medically responsible for overseeing the training of a trainee – the AOA or the ACGME?  The discovery and deposition phases of this lawsuit should clarify this important question and should further clarify the relevance, or lack thereof, of the MCH contract in Plaintiff's dismissal from LECOM's, not MCH's, Internal Medicine Residency Program.

15.  One further piece of evidence strengthens this critical point.  In LECOM's website, https://lecomhealth.com/community-hospital/medical-education/, it states, "The Lake Erie College of Osteopathic Medicine is the ACGME Sponsoring Institution of the ACGME accredited residency and fellowships at Millcreek Community Hospital."  It doesn't say Millcreek Community Hospital is the sponsoring institution.  Defendant's website further states, "Graduate medical education (GME) refers to the period of education in a particular specialty (residency) or subspecialty (fellowship) following medical school; **the ACGME oversees the accreditation of residency and fellowship programs in the U.S.**"  Even Defendant's own website does not state that the AOA oversees the accreditation of residency and fellowship programs in the U.S.  Thus, the MCH contract of Exhibit D cannot be applied to Plaintiff's academic and educational progress or lack thereof as the basis for dismissal from Defendant's residency program.

16.  With respect to the educational nature of residency, the financial compensation to a teaching hospital (essentially, tuition payments) originates from the

_____

[4] A true and correct copy of the Pennsylvania license is attached hereto as Exhibit F.

Centers for Medicare and Medicaid Services (CMS). Plaintiff stresses that this funding

constitutes **federal, taxpayer dollars**. The monetary investment towards the formal

education and training of resident physicians in America commands significant

government and public interest and oversight.

17. Thus, a true contract existed with all required legal elements in place. There

was a written agreement (ACGME requirements), in which an **offer** had been made;

**acceptance** by the Defendant to execute all mandatory requirements resulting in

accreditation; **acceptance** by the Plaintiff who reasonably expected legitimate

employment and proper graduate medical education; and **consideration** (taxpayer dollars

from CMS) paid to the Defendant with a salary paid to the Plaintiff ($50,500/year).

18. The ACGME's requirements contain very stringent rules to protect and

nurture the dual character of a resident physician at a training hospital. Resident

physicians are entitled to all the rights and privileges of any other employee working in

the United States of America. Concurrently, resident physicians are assured, under the

ACGME's requirements, of receiving frequent, direct supervision by board-certified

attending physicians who assume varying degrees of legal and medical responsibilities in

the teaching, mentoring, and instruction of individual student doctors into confident,

independent attending physicians. The ACGME Program Requirements for Residency

Education in Internal Medicine, Exhibit B, section IV. Educational Program, states, "An

accredited residency program in internal medicine must provide 36 months of **supervised**

graduate education." The academic persona of the student doctor is plainly evident when

learners "graduate" from their internal medicine residency program after 36 months.

They ascend to the status of attending physician and are no longer **student** doctors.  To

be clear, Plaintiff's ultimate dream is to become a board-certified attending physician.

19.  Plaintiff's License Number was OT018202.  This license was issued by the

Commonwealth of Pennsylvania Department of State, Bureau of Professional and

Occupational Affairs.  The Registration Code was 19320244.  See Exhibit F.  To repeat

for emphasis, student doctors are trainees, not board-certified attending physicians, and

this severely limits their stature at training hospitals.  A trainee functions from a much

weaker position of power and authority compared to their attending physicians.

20.  The statute of limitations for a breach of contract in the Commonwealth of

Pennsylvania is four years.  Although Plaintiff's contract of employment ended on June

30, 2019, Plaintiff argues that many breaches of contract occurred before and on April

17, 2019.  Plaintiff filed this civil lawsuit in Erie County's Court of Common Pleas on

April 13, 2023 before the statute of limitations for breach of contract in Pennsylvania

expired on April 17, 2023.  Defendant removed Plaintiff's complaint and elevated it to

the United States District Court for the Western District of Pennsylvania.

### COUNT I:  BREACH OF CONTRACT

21.  The ACGME Program Requirements for Residency Education in Internal

Medicine, Exhibit B, section IV,C,1,a),(1),(a-c), states, "on all inpatient and consultative

teaching services, teaching rounds must be regularly scheduled and formally conducted.

Teaching rounds must include direct resident and attending interaction with the patient,

and must include bedside teaching and the demonstration of interview and physical

examination techniques.  Teaching rounds must occur at least **three days** of the week for

9

a minimum total of **four and a half hours** per week." Evidence through discovery and

deposition of expert witnesses in the form of a dozen former-internal medicine resident

physicians will prove that Dr. Erie Milie failed to perform and to enforce these

mandatory teaching rounds. His morning rounds were quick with practically no teaching

of resident physicians. During Plaintiff's time in his Internal Medicine Residency

Program, 4.5 hours of training per week would have equated to 4.5 hrs x (67 weeks) =

301.5 hours of direct, face-to-face training with patients and attending physicians,

including Dr. Erie Milie. Per Exhibit G, LECOM's Position Statement to Plaintiff's

EEOC charge,[5] LECOM states, "In the end, he was not permitted to advance because he

failed to master for his level the core competency of Medical Knowledge needed to

progress." If the teacher doesn't teach, is it really the student's fault if the learner is

found to have a deficiency in knowledge? And because the LECOM teacher was

required to teach via ACGME requirements and paid to teach with Medicare and

Medicaid funds, his negligence constitutes a serious breach of contract.

22. The ACGME Program Requirements for Residency Education in Internal

Medicine, Exhibit B, Section II, A, 4, r), states, "The program director must dedicate no

less than 50% (at least 20 hours per week) of his or her professional effort to the internal

medicine educational program and receive institutional support for this time. This effort

must be devoted to administrative and educational activities of the internal medicine

---

[5] A true and correct copy of LECOM's EEOC Position Statement is attached hereto as
Exhibit G.

educational program." During Plaintiff's time in Dr. Milie's Internal Medicine Residency Program, 20 hours per week would have equated to 20 hrs x (67 weeks) = 1,340 hours of quality training. The Program Director failed to perform this essential duty which deprived Plaintiff of the training he so desperately needed. Per Exhibit F, LECOM's Position Statement to the EEOC states, "The record shows that the Residency Director did his level best to see that this doctor had a fair shot at making it through PGY-1 to PGY-2." Plaintiff strongly disagrees with this statement based on the observed absence of mentoring by Defendant's Internal Medicine Program Director.

23. The ACGME Program Requirements for Residency Education in Internal Medicine, Exhibit B, Section II,A,4,a), states, "The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. The program director must oversee and ensure the quality of didactic and clinical education in all sites that participate in the program." Expert witness testimony from former-internal medicine resident physicians will show that Dr. Erie Milie rarely attended didactic training (lectures) with his internal medicine residents. Mandatory lectures occurred for approximately 2 hours per week on Monday evenings later rescheduled to Friday mornings. Thus, the Program Director and the other attending physicians deprived the internal medicine resident physicians of 2 hrs x (67 weeks) = 134 hours of direct, face-to-face training during Plaintiff's tenure. Per Exhibit F, LECOM's Position Statement to the EEOC states, "Finally, any comparison between the Claimant and Dr. Grant fails to show discrimination because Dr. Grant's issues were not based on a lack of medical knowledge. Rather immaturity. Also I can attest that efforts

11

to correct Dr. Grant succeeded and he remains on track to complete his program on time." Where were the efforts by Defendant's Program Director for other faculty members to correct Plaintiff's medical knowledge deficiencies? Dr. Milie could have provided Plaintiff with face-to-face training during those 134 hours of lectures. His failure to provide top-quality didactic training to Plaintiff is a breach of contract.

24. The ACGME Program Requirements for Residency Education in Internal Medicine, Exhibit B, Section II,A,4,m), states, "The program director must be familiar with and comply with ACGME and Review Committee policies and procedures as outlined in the ACGME Manual of Policies and Procedures." Plaintiff highlights the fact that Dr. Erie Milie had a contractual duty to execute all ACGME requirements as written. His failure to execute this mandate constitutes another breach of contract.

25. In early-April 2019, a patient fell to the floor in Plaintiff's close proximity. The incident occurred in the hospital's emergency room (ER) while Plaintiff was interviewing the patient. Due to HIPPA regulations, very limited information can be disclosed concerning the patient. Regardless, follow-up examination revealed that the patient did not suffer any life-threatening, permanent, or even serious injury from the fall in the ER. Plaintiff assumed that the fall was of minor consequence and that proper medical treatment should proceed per sound medical practice. It is well documented that a patient who is admitted to a hospital for any length of time may experience a fall despite numerous precautions taken by hospital employees.

26. On April 17, 2019, Plaintiff sat down for a third and final performance evaluation meeting. The others in attendance were Dr. Erie Milie, Mr. John Onorato,

Esq. MBA (Human Resource, Risk Officer, and MCH lawyer), Deborah Lee-Sanko

(DIO), and Kaitlin Hanes (Internal Medicine Coordinator). All four individuals were

employees and agents of the Defendant. Mr. John Onorato started the meeting by

informing the Plaintiff that an investigation was conducted concerning the patient fall in

early-April (a few weeks earlier). Plaintiff was not aware that an investigation had been

conducted. Plaintiff had not received any communication whatsoever from the Internal

Medicine Program Director, the hospital lawyer, other doctors, or even any nurses of

such an investigation. At that moment, Plaintiff assumed Mr. Onorato would ask for an

oral or written statement as required under due process procedures. But then, Mr.

Onorato stated that the investigation had been completed; the results were typed up into a

formal report; and the document was sent to the Pennsylvania Patient Safety

Administration, 333 Market Street, Lobby Level, Harrisburg, PA 17101. Once Mr.

Onorato divulged this information, Plaintiff realized unequivocally that his right to due

process was illegally and unethically withheld from him by Defendant's lawyer.

27. The ACGME's Common Requirements, Exhibit C, Section VI.A.1.a).(3),

states, "reporting, investigation, and follow-up of adverse events, near misses, and unsafe

conditions are pivotal mechanisms for improving patient safety, and are essential for the

success of any patient safety program... Residents **must** participate as team members in

real and/or simulated interprofessional clinical patient safety activities, such as root cause

analyses or other activities that include analysis, as well as formulation and

implementation of actions." By not involving the Plaintiff in the formal investigation of

a patient safety adverse event, this constitutes a breach of contract in addition to the

withholding of Plaintiff's legal right to due process of law.

28.  The ACGME Common Requirements in Exhibit C further state,

VI.A.1.a).(3).(a).(iii), "Residents, fellows, faculty members, and other clinical staff

members must be provided with summary information of their institution's patient safety

reports."  Plaintiff was not provided any report of the patient fall incident in early-April

2019.  This deprivation constitutes an additional breach of contract.

29.  Documentation from the Defendant after the fall incident and after the filing

of Plaintiff's complaint shows the characterization of the Plaintiff as "a threat to patient

safety" or "a threat to patient care."  Plaintiff unequivocally argues to the contrary.

Plaintiff is a fierce advocate for patient safety.  One questionable adverse incident in 472

days of employment does not make Plaintiff a threat to anyone.  Further, since Plaintiff

has yet to provide a statement in his defense to anyone in authority, Plaintiff has the right

to be assumed innocent until proven guilty through the exercise of due process of law.

Plaintiff requests this right from the court and requests discovery to reveal the facts of the

patient fall.  In addition, since Plaintiff was denied his right to due process during a

formal investigation, Plaintiff will motion for the results of the investigation to be

dismissed as evidence if the Defendant attempts to admit it as evidence in court.

30.  More violations occurred during the April 17, 2019 meeting.  Defendant's

Internal Medicine Program Director, Dr. Erie Milie, informed the Plaintiff that he was

dismissed from Defendant's Internal Medicine Residency Program effective

immediately.  Both he and Mr. John Onorato then exited the room.

31. The first breach centers on training. The ACGME Program Requirements for Residency Education in Internal Medicine, Exhibit B, II.A.4.t) states, "The Program Director **must** have the authority to ensure effective teaching, and obtain teaching commitments from other departments involved in the education of internal medicine residents." Plaintiff trusted his Program Director to assign individualize and/or comprehensive teaching as needed when deficiencies were identified in the Plaintiff's performance in any of the ACGME core competency areas. Plaintiff had reasonably assumed that his progress with the Defendant was satisfactory per the positive marks and scores on his monthly performance evaluations written by Dr. Milie and other faculty members. Plaintiff was not afforded any tailored tutoring sessions, reading lists, one-on-one instruction, and other academic remedies by any of the attending physicians during his enrollment. But with his sudden dismissal from the Internal Medicine program, Plaintiff concluded that Dr. Milie was completely derelict in his duty to train Plaintiff. The discovery of this breach of contract occurred on the morning of April 17, 2019.

32. Another breach concerns the suppression of Plaintiff's academic due process rights. In the ACGME Program Requirements for Residency Education in Internal Medicine, Exhibit B, VI.J. Grievance procedures and due process, the requirement states, "1. In the event of an adverse annual evaluation, a resident must be offered an opportunity to address a judgment of academic deficiencies or misconduct before a formally constituted clinical competence committee. 2. There must be a written policy that ensures that academic due process is provided."

15

33.  This clinical competency committee (and subsequent academic due process) was never offered or afforded to Plaintiff after a November 19, 2018 performance meeting, after a February 11, 2019 performance meeting, and after the April 17, 2019 performance meeting.  Again, Plaintiff had reasonably assumed that his progress with the Defendant was satisfactory based on the positive marks and scores contained in his monthly performance evaluations written by Dr. Milie and other faculty members. Defendant had every opportunity to afford academic remedies and academic due process to the Plaintiff but failed to do so.  Because Plaintiff was dismissed from the program on April 17, 2019, no further opportunities existed for the Plaintiff to receive academic due process.  Therefore, a breach of contract occurred, starting on April 17, 2019.

34.  In the ACGME Common Requirements, Exhibit C, V.A.1.a, it states, "At a minimum, the Clinical Competency Committee must be composed of three members of the program faculty.  (a) These additional members must be physician faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents in patient care and other health care settings."  Plaintiff points out that the other attendees of the three performance meetings consisted of a lawyer, a Designated Institutional Official (DIO), and a secretary, none of whom were board-certified attending physicians who maintained extensive contact and experience with residents in patient care and other health care settings.

35.  Another breach of contract occurred several minutes after the April 17, 2019 meeting.  The devastating dismissal from LECOM's Internal Medicine Residency Program left Plaintiff in a state of shock.  Dr. Erie Milie and Mr. John Onorato did not

16

ask Plaintiff to sign any document during the meeting. After a brief discussion with

Deborah Lee-Sanko and Kaitlin Hanes, Plaintiff walked several feet down the hallway to

the hospital's library and sat down to try to process what just happened. Suddenly,

Kaitlin Hanes entered the library, walked up to Plaintiff, and told Plaintiff to sign a piece

of paper. Plaintiff did so, and she left the library immediately. Plaintiff does not

remember what was signed. Plaintiff later asked her for a copy, but she never gave one.

36. As she stood next to Plaintiff in the library, Kaitlin Hanes, at no point,

informed Plaintiff of his Miranda rights, Plaintiff's right to remain silent, or Plaintiff's

right to an attorney. In this period of deep shock, Plaintiff was not in any kind of

emotional, mental, or intellectual state to knowingly and willingly agree to waiving any

of Plaintiff's rights. In other words, Plaintiff was unable to achieve informed consent that

day while in a state of shock after the April 17, 2019 meeting. Kaitlin Hanes should have

known this as well. Furthermore, none of the four individuals met with Plaintiff the

following day, April 18, 2019, or later to guide Plaintiff on how to take the next steps

with an appeal process. Plaintiff will argue in court that any document that Plaintiff

signed on April 17, 2019 if presented by the Defendant as evidence should be thrown out.

37. The ACGME Program Requirements for Residency Education in Internal

Medicine, Exhibit B, II.A.4.h), states, "the Program Director **must ensure compliance**

with grievance and due process procedures as set forth in the Institutional Requirements

and implemented by the sponsoring institution." The requirements clearly identify Dr.

Erie Milie as primarily responsible for guaranteeing and enforcing Plaintiff's right to due

process, not Kaitlin Hanes. The Internal Medicine Program Director, yet again, failed in

17

his contractual duty to properly inform Plaintiff of his right to appeal, the right to file a

grievance, the right to legal counsel, the right to remain silent, the right to be helped by a

Clinical Competency Committee, and the right to due process.  Dr. Milie's inactions

constitute a serious, unethical, and egregious breach of contract.  Nothing in the ACGME

requirements even remotely encourages such wanton disregard for the rights of a student

doctor or trainee employed and enrolled at an accredited training hospital.

38.  In another important matter, Plaintiff had suspicions of discrimination in 2018

when a fellow Internal Medicine Resident Physician of the Class of 2017 was promoted

to second year of residency despite being fired from his Corry hospital rotation, being

removed from the Weekend On-Call schedule for nine months, and being forbidden from

performing a month of IM Nights at Millcreek Community Hospital during the first half

of his Internal Medicine residency.  Since suspicion does not equate to evidence, Plaintiff

needed a neutral, credible third party to validate his suspicions.

39.  Plaintiff's last full day of employment and enrollment was on June 30, 2019.

In October 2019, Plaintiff received legal counsel from a lawyer contracted with the

Department of Veterans Affairs who recommended that a case of discrimination be filed

with the Equal Employment Opportunity Commission (EEOC) at the Pittsburgh Area

Office, 1000 Liberty Avenue, Room 1112, Pittsburgh, PA 15222.  Plaintiff followed the

legal counsel afforded to him.  Then, on March 6, 2020, Defendant submitted a Position

Statement to the EEOC in response to Plaintiff's EEOC charge.  On page 3 of Exhibit G,

the Defendant wrote, "Page 1 of a Report to the Pennsylvania Patient Safety

Administration – The report of our patient safety officer of a type "D" event, which is

18

among the most serious, the facts of which as set forth in Dr. Edwards Affidavit." With

their Position Statement, the Defendant had now informed a **federal** agency of the fall

incident without ever having afforded Plaintiff his right to make a statement during a

formal investigation and his right to due process of law as required by the ACGME

requirements. Of note, the Defendant's Position Statement to the EEOC was signed by

Mr. John Onorato, MCH's lawyer.

40. In December 2021, the EEOC finally made a ruling concerning Plaintiff's

case. The two-year investigation revealed that the EEOC could not determine whether

racial and/or age discrimination occurred at MCH, but the EEOC did issue Plaintiff a

Right to Sue Letter,[6] Exhibit H. Unfortunately, Plaintiff was unable to afford a lawyer to

represent him in a discrimination lawsuit against the Defendant. The charge number for

Plaintiff's EEOC case is: 533-2020-00178. The EEOC investigator was Victoria Rodia.

41. The EEOC's Right to Sue letter, Exhibit H, dated October 6, 2021, states,

"The EEOC issues the following determination: The EEOC will not proceed further with

its investigation and makes no determination about whether further investigation would

establish violations of the statute. This does not mean the claims have no merit. **This**

**determination does not certify that the respondent is in compliance with the**

**statutes**. The EEOC makes no finding as to the merits of any other issues that might be

construed as having been raised by this charge." Plaintiff stresses to the court that the

EEOC did not rule that "The facts alleged in the charge fail to state a claim under

---

[6] A true and correct copy of the EEOC Right to Sue Letter is attached as Exhibit H.

any of the statutes enforced by the EEOC." From this determination in the Right to Sue

letter, Plaintiff concluded that he may have mostly likely been a victim of unlawful

discrimination.

42.   With that, Plaintiff claims that Defendant committed another breach of

contract. In the ACGME Common Program Requirements, Exhibit C, VI.B.6, it states,

"Programs must provide a professional, respectful, and civil environment that is free from

mistreatment, abuse, or coercion of students, residents, faculty, and staff. Programs, in

partnership with their Sponsoring Institutions, should have a process for education of

residents and faculty regarding unprofessional behavior and a confidential process for

reporting, investigating, and addressing such concerns." Plaintiff argues that the

advancement of a fellow Internal Medicine Resident Physician of the Class of 2017,

despite all of his problems, while not advancing Plaintiff, despite his successful

achievement of mandatory milestones, constitutes an **unprofessional, disrespectful, and**

**uncivilized** environment. This constitutes another breach of contract. And this

determination was reached on October 6, 2021 with the publishing of the EEOC Right to

Sue letter. This date falls well within the four-year statute of limitations for breach of

contract. The statute starts on the date that the contract was determined to be breached.

That determination occurred on October 6, 2021.

43.   Several other facts warrant the court's strongest consideration. In 2020, the

Defendant's Internal Medicine Program Director, Dr. Erie Milie, was removed from his

position by the ACGME for cause. Plaintiff has been unable to acquire documentation

from the ACGME or elsewhere concerning the nature of Dr. Milie's dismissal. He was

replaced by Dr. Jean Storm.  Then, on July 31, 2022, the ACGME withdrew the

accreditation of the Internal Medicine Residency Program from the Defendant and from

Millcreek Community Hospital.  See Exhibit A.  However, Plaintiff has been unable to

acquire documentation from the ACGME or elsewhere that explains in detail **why** they

took such drastic action.  These two powerfully probative pieces of evidence strongly

suggest major problems with the Defendant.  Plaintiff asks, "would Dr. Milie have been

fired and the Defendant have lost accreditation if both had rigorously executed all

ACGME requirements satisfactorily?"  The destruction of Plaintiff's career and all

subsequent financial injuries may have been completely avoided if Plaintiff attended a

legitimate training hospital with competent, caring, passionate, and ethically-guided

attending physicians who strictly adhered to ACGME requirements.  And what unknown

harms have been inflicted on the community of Erie, Pennsylvania during Dr. Eric

Milie's tenure as Defendant's Internal Medicine Program Director?

    44.  By reason of the facts and circumstances stated above, Defendant has

breached ACGME's contract in several critical areas.  More breaches of contract will

most likely be found during the discovery and deposition phases of this case if this

lawsuit is allowed to move forward by the court.

    45.  As a direct result of the failures of the Defendant to properly train the Plaintiff

per ACGME requirements, Plaintiff has subsequently suffered massive, substantial, and

permanent injury.  Refusal to promote Plaintiff to his second year of residency and

releasing Plaintiff from LECOM's Internal Medicine Residency Program prematurely

have imbued glaring "red flags" that other employers in the medical field cannot ignore.

Plaintiff has, thus, been unable to secure employment within another residency program at another hospital anywhere in the United States or abroad. Plaintiff was willing to repeat first year of residency so Plaintiff applied to the 2022 Match. No hospital offered Plaintiff an interview. During the SOAP phase of the 2022 Match, Plaintiff did receive only one 3-minute telephone interview with a program director at a training hospital in Cleveland, Ohio. But Plaintiff was not offered a spot in their internal medicine residency program.

46. Plaintiff's wife wanted to leave Erie, PA for another more diverse city with more job opportunities. So, both moved to Las Vegas, Nevada. Because Plaintiff is a first-generation American to parents who immigrated from the Philippines, no generational wealth exists to help the Plaintiff and his wife. Consequently, Plaintiff and his wife have struggled financially since mid-2019. Paying overwhelming student loan debts has been particularly frustrating each month. As of this writing, Plaintiff's TransUnion score is 485. Plaintiff even applied to secondary medical positions in Las Vegas, such as transcriptionist, phlebotomist, and physician assistant. But no jobs were offered to the Plaintiff. Why should a small clinic hire a medical doctor to just perform the work of a receptionist? Should a medical doctor be paid $14/hr?

47. Since no one in the medical community would hire Plaintiff despite major staffing shortages, Plaintiff had no choice but to accept work as an Uber Eats delivery driver in August 2021 in order to generate some income. As of this writing, Plaintiff has completed 3,303 deliveries of pizza, sushi, and McDonalds to the people of Las Vegas, Nevada. A medical doctor with an advanced degree should not be delivering barbeque

chicken, ice cream, and boba tea to teenagers and young adults. With each food delivery, Plaintiff feels profound humiliation, embarrassment, and rage. Plaintiff deeply regrets giving up a promising career as a U.S. Naval Officer who graduated from the U.S. Naval Academy in May, 1996 and who completed a combat tour in Iraq in 2006-2007. Plaintiff's pay as an Uber Eats driver during a very busy month of deliveries, at best, climbs to only 4.7% of the monthly pay that an internal medicine attending physician earns. Plaintiff's current lifestyle is unacceptable and unsustainable.

48. The accumulated struggles that have befallen Plaintiff and his wife have severely damaged marital well-being along with festering tremendous emotional, mental, and even physical suffering in both. Plaintiff struggles with sleep, anxiety, and depression daily. Plaintiff requires two medications to control hypertension. Plaintiff and his wife argue constantly about how to progress with their lives. Suggestions of divorce are frequent. Even Plaintiff's parents have anguished at the situation with the Plaintiff's father essentially shutting him out of his life. Plaintiff has lost most of his closest friends, and the majority of family members have stopped communicating with him. Plaintiff has exhausted all options to resolve his situation through the medical system. Now, Plaintiff seeks dispute resolution through the courts. Without substantial financial resources to pay for a lawyer, Plaintiff has no choice but to move forward with a lawsuit as a pro se litigant, for now.

## PRAYER FOR RELIEF

49. Thus, as compensation for lost wages from a now destroyed 20-year medical career, compensation for consequential damages including a poor credit score and higher

interest rates on payday loans, for four years of emotional distress, and punitive damages

for breach of contract, Plaintiff is asking for $50 million dollars.

WHEREFORE, Plaintiff requests judgment in his favor and against the Defendant

for:

1.  Breach of contract.

and also

2.  $50 million dollars representing the total value of all lost future income,

reputational damage, emotional distress, and punitive damages which are the

subject matter of this complaint.

Respectfully submitted,

Signature:          *Daniel A. Salvatierra, D.O.*

Address:            P.O. Box 777183
                    Henderson, NV 89077

Phone number:       (410) 940-5527

**VERIFICATION**

I, Daniel A. Salvatierra, D.O., state that I am the Plaintiff in the foregoing matter and

that the facts set forth in the foregoing Complaint are true and correct to the best of my

knowledge, information, and belief.  I further understand that false statements made

herein are subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn

falsification to authorities.

Date: June 11, 2023          *Daniel A. Salvatierra, D.O.*

(signature of Plaintiff)